1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   RENE FUENTES,                        )   1:10-cv-00003-AWI-JLT HC
                                          )
12              Petitioner,               )   FINDINGS AND RECOMMENDATIONS
                                          )   TO DENY PETITION FOR WRIT OF
13        v.                              )   HABEAS CORPUS  (Doc. 1)
                                          )
14   FERNANDO GONZALES, Warden,           )   ORDER DIRECTING THAT OBJECTIONS BE
                                          )   FILED WITHIN TWENTY DAYS
15              Respondent.               )
     ─────────────────────────────────── )

16

17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                              **PROCEDURAL HISTORY**

20        Petitioner is in custody of the California Department of Corrections and Rehabilitation

21   ("CDCR") serving, inter alia, an indeterminate sentence of life without the possibility of parole,

22   pursuant to a judgment of the Superior Court of California, County of Kern (the "Superior Court").

23   On August 22, 2007, Petitioner was convicted by jury trial of the following: (1) count one charging

24   willful and premeditated murder of Arredondo (Cal. Pen. Code § 187); (2) counts two, three, and

25   four charging attempted murder of Guzman, Perez, and Calderon (Cal. Pen. Code §§ 187, 664); (3)

26   count five charging firing a gun from a car at persons outside the car (Cal. Pen. Code §12034 ( c); (4)

27   count nine charging that the June 24 shooting constituted participation in a criminal street gang

28   within the meaning of Cal. Pen. Code §186.22(a).  In addition, counts one through five each

1  contained four enhancement allegations (for a total of twenty such allegations) that Petitioner

2  personally and intentionally fired a gun causing great bodily injury or death pursuant to Cal. Pen.

3  Code §12022.53(d).  Counts one through five also each included enhancement allegations stating

4  that Petitioner committed the crimes for the benefit of a criminal street gang.  (Cal. Pen. Code

5  §186.22(b)(1)).  Counts one through four and count nine included enhancement allegations that

6  Petitioner personally used a gun.  (Cal. Pen. Code §12022.5(a)).

7      Petitioner was sentenced to the following: (1) for count one, murder as enhanced, life in

8  prison without the possibility of parole, plus a consecutive enhancement pursuant to §12022.53(d) of

9  25-years-to-life; (2) for count two, attempted murder, a consecutive upper term of nine years, a

10  consecutive enhancement pursuant to § 186.22(b)(1) of ten years, and a consecutive enhancement

11  pursuant to § 12022.53(d) of 25-years-to-life; (3) for counts three and four, attempted murder,

12  consecutive terms of two years and four months each, equal to one-third of the middle term, plus

13  consecutive enhancements of three years and four months each pursuant to § 186.22(b)(1), plus 25-

14  years-to-life each pursuant to § 12022.53(d); and (4) for count six, shooting at an inhabited dwelling

15  as enhanced, fifteen-years-to-life.  Sentences for counts five, seven, eight, and nine were stayed

16  pursuant to § 654.  The total sentence was life without parole plus 115 years to life plus 30 years and

17  four months.

18      Petitioner subsequently filed a direct appeal in the California Court of Appeal, Fifth

19  Appellate District (the "5th DCA"), which, on March 6, 2009, in a partially published decision,

20  affirmed Petitioner's conviction.[1]  Petitioner then filed a petition for review in the California

21  Supreme Court, which, on June 10, 2009, was denied.  Petitioner filed the instant petition on

22  December 31, 2009.  (Doc. 1).  On May 14, 2010, Respondent filed an Answer.  (Doc. 14).

23  Petitioner did not file a Traverse.  Respondent concedes that the claims herein are exhausted.  (Doc.

24  14, p. 8).

---

[1] People v. Fuentes, 171 Cal. App.4th 1133 (2009).  Because the portion of the 5th DCA's opinion that was published dealt only with ground three in the instant petition, this Findings and Recommendations, with the exception of the statement of fact, which is taken directly from the partially published opinion, will cite to the full 5th DCA opinion submitted by Petitioner as Appendix A to the petition. It will be cited as "Doc. 1, App. A, p. __".

# FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's partially published decision:

Fuentes, who was 18 years old at the time of the shootings, was known in the Bakersfield police as a member of the Varrio Rexland Park (VRP), a Sureño criminal street gang he joined when he was 14. He had the letters "VRP" tattooed across his abdomen, the number 13 on a finger, and three dots near his left eye. The number 13 referred to the 13th letter of the alphabet, M, which stands for Mexican Mafia, the prison gang organization under which Sureño gangs operate. The three dots were also a Sureño symbol. Fuentes claimed VRP membership when he was arrested for the current offenses and during other encounters with the police.

The victims of the shootings were Margarito Perez, Jaime Calderon, Jose Guzman, and the deceased, Jesus Arredondo. Margarito Perez was a member of Cycos 13, a gang based in Los Angeles with about 20 members in and around Bakersfield. Though both are Sureño gangs, VRP and Cycos 13 are rivals. Perez lived with his mother in territory claimed by VRP, two blocks away from Fuentes's house. Perez knew Fuentes from the neighborhood. Calderon was Perez's half-brother. Guzman and Arredondo were friends of Perez.

Episodes of gang-related tension involving Fuentes and some of the victims took place prior to the shootings. Someone fired shots at Guzman's house. Guzman fought with a VRP member known as Silent; Silent pulled a knife. Fuentes came to Guzman's house to say Guzman should get out of the neighborhood. Guzman went to see Fuentes to say he did not want trouble; he believed Fuentes gave his word to cease hostilities, but the hostilities continued. A group of VRP members confronted Calderon, thinking he was Perez; one of the members pulled a gun. Someone painted Cycos 13 graffiti on the sidewalk in front of Fuentes's house. Someone else crossed it out.

The first shooting took place on June 14, 2006. Perez was in his front yard with his 18-month-old nephew. A brown Mitsubishi Galant drove by. Fuentes, wearing a bandanna and a blue Kansas City Royals cap (bearing the legend K.C.) to signify his membership in a Kern County Sureño gang, fired a gun from the front passenger seat. Calderon's car, parked in front of the house, was hit by a bullet. Perez grabbed the child and ran inside.

The second shooting happened on June 24, 2006, in the parking lot of a shopping center at the corner of Ming Avenue and Stine Road. Perez, Calderon, Guzman, and Arredondo drove there together after dark. They got out and watched cars drive around the parking lot. They brought beer to drink and hoped to meet girls.

At about the same time, Fuentes arrived at the parking lot as a passenger in a green Lexus belonging to the parents of Fabian Lopez, a member of a Sureno gang called Bakers 13. Fuentes, Lopez, and Fuentes's cousin Silviero, a VRP members known as Gumby, were in the car. Gumby was driving. As they drove around the parking lot, Fuentes saw Perez's group and became agitated. "[T]here them fools are," he said. "[W]here at," Gumby replied. Lopez said, "[L]et's take off." As Gumby steered the car out of the parking lot onto Ming Avenue, they again passed Perez's group. Lopez then heard shots coming from the back seat, behind him. Only Fuentes was sitting in the back seat.

Before the shots were fired, when the Lexus first passed Perez's group, Guzman saw Fuentes's face in the rear passenger-side window. Fuentes stared at Guzman with an angry look. Guzman expected trouble and pointed the car out to Perez. Subsequently, Perez heard the shots and turned to see Arredondo on the ground bleeding. Guzman was also hit. Perez

1    drew a gun from his waistband and ran into Ming Avenue, and fired at the departing car.

2    Arredondo was shot once in the back.  The bullet fractured two vertebrae, lacerated the aorta,
     pierced several loops of the small intestine, and exited his abdomen.  He died that night at a
3    hospital.  Guzman was shot once through the left shoulder.  A second bullet grazed his right
     cheek.

4

5    People v. Fuentes, 171 Cal.App.4th 1133, 1135-1136 (2009); Doc. 1, App. A, pp. 211-212.

6                                         **DISCUSSION**

7    **I.  Jurisdiction**

8            Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

9    to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of

10   the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362,

11   375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the

12   United States Constitution.  The challenged conviction arises out of the Kern County Superior Court,

13   which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.

14   § 2241(d).  Accordingly, the Court has jurisdiction over this action.

15           On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

16   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

17   Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries

18   v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on

19   other grounds by, Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed

20   after statute's enactment).  The instant proceedings were initiated by the filing of the original petition

21   on December 31, 2009, after the enactment of the AEDPA, and thus this case is governed by the

22   AEDPA.

23   **II.  Legal Standard of Review**

24           A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he

25   can show that the state court's adjudication of his claim:

26        (1)  resulted in a decision that was contrary to, or involved an unreasonable application of,
          clearly established Federal law, as determined by the Supreme Court of the United States; or

27

28

1      (2)  resulted in a decision that "was based on an unreasonable determination of the facts in
       light of the evidence presented in the State court proceeding.

2

3    28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S.

4    at 412-413.

5         The first prong of federal habeas review involves the "contrary to" and "unreasonable

6    application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and mixed

7    questions of law and fact.  Williams v. Taylor, 529 U.S. at 407-410;  Davis v. Woodford, 384 F.3d

8    628, 637 (9th Cir. 2004).  A state court decision is "contrary to" clearly established federal law "if it

9    applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it

10   confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but

11   reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor,

12   529 U.S. at 405.  A state court decision involves an "unreasonable application" of clearly established

13   federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively

14   unreasonable manner."  Brown v. Payton, 544 U.S. at 141; Woodford v. Visciotti, 537 U.S. 19, 24-

15   25 (2002).

16        Consequently, a federal court may not grant habeas relief simply because the state court's

17   decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable.

18   Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In

19   Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 1388 (2011), the U.S. Supreme Court explained that

20   an "unreasonable application" of federal law is an objective test that turns on "whether it is possible

21   that fairminded jurists could disagree" that the state court decision meets the standards set forth in

22   the AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at

23   786.  As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or

24   involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet,"

25   because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against

26   extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction.

27   Richter, 562 U.S. ___, 131 S.Ct. at ___(slip op. at 12-13)(quoting Jackson v. Virginia, 443 U.S. 307,

28

332, n. 5 (1979)(Stevens, J., concurring).  The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. ___, 131 S.Ct. at ___(slip op. at 13).

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment"). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d),  the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

**III.  Review of Petitioner's Claims.**

The instant petition itself alleges five grounds for relief.

**Ground One**          **The trial court violated Petitioner's Fourteenth Amendment rights by misinstructing the jury on first-degree felony murder by "drive-by" shooting**

Petitioner first contends that the trial court violated his Fourteenth Amendment rights by misinstructing the jury on first-degree murder perpetrated by means of discharging a firearm from a motor vehicle.  This contention is without merit.

**A.          General Principles Regarding Trial Error In Instructing Jurors**

This Court's review of Petitioner's claim of state instructional error is "limited to deciding whether [his] conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991); 28 U.S.C. § 2241.  In order to grant federal habeas relief on the basis of faulty jury instructions, the Court must first conclude that the alleged error was of constitutional magnitude.  See California v. Roy, 519 U.S. 2, 117 S.Ct. 337, 338 (1996).

In order to grant federal habeas relief on the basis of faulty jury instructions, the Court must conclude that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict." California v. Roy, 519 U.S. 2, 5, 117 S.Ct. 337, 338 (1996); Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722 (1993).  Federal habeas relief is warranted only if the Court, after reviewing the record, has "grave doubt" as to the error's effect. Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir.1998)   "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37 (1977).  The trial court's error in omitting a jury instruction is less likely to be prejudicial than the trial court's misstatement of the law.  Henderson, 431 U.S. at 155, 97 S.Ct. at 1737; see also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.1997) (habeas petitioner whose claim involves a failure to give a particular instruction bears an especially heavy burden).

To evaluate the affect of jury instructions, the Court must look at the context of the entire

1   trial and overall charge to the jury.  Estelle v. McGuire, 502 U.S. 62, 72 (1991); Prantil v. California,

2   843 F.2d 314, 317 (9th Cir. 1988). They may not be judged in artificial isolation.  Estelle, 502 U.S. at

3   72. In addition, a reviewing court's principal constitutional inquiry is whether there is a reasonable

4   likelihood that the jury applied the challenged instructions in a way that violates the Constitution.

5   See id.

6          While a state is generally free to define the elements of an offense, once the state has defined

7   the elements, due process requires that the jury be instructed on each element and instructed that they

8   must find each element beyond a reasonable doubt. Francis v. Franklin, 471 U.S. 307, 313, 105 S.Ct.

9   1965, 1970 (1985); In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072 (1970); United States v.

10  Perez, 116 F.3d 840, 847 (9th Cir.1997) (en banc);  Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir.

11  1998).  Due process requires that the jury be instructed on each element of the offense.   Keating v.

12  Hood, 191 F.3d 1053, 1061 (9th Cir. 1991); Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir. 1998).

13         It necessarily follows, therefore, that constitutional trial error occurs when a jury makes a

14  guilty determination on a charged offense without a finding as to each element of the offense.

15  According to the Supreme Court, a jury instruction that omits an element of the offense constitutes

16  such an error.  Neder v. United States, 527 U.S. 1, 8 (1999).  However, such an error "does not

17  necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt

18  or innocence." Id. at 9.  Provided that such an error occurred, Petitioner's conviction can only be set

19  aside if the error was not harmless under Chapman v. California, 386 U.S. 18 (1967).  Neder, 527

20  U.S. at 15.  Under the Chapman harmless error test, it must be determined "beyond a reasonable

21  doubt" whether "the error complained of did not contribute to the verdict obtained." Chapman, 386

22  U.S. at 24.

23         **B.     The 5th DCA's Analysis**

24         The 5th DCA rejected Petitioner's claims by concluding that, although the trial court did err in

25  failing to instruct the jury regarding the need to find that Petitioner intended to kill Arredondo, the

26  error was harmless because the jury was required to make that finding in other parts of its verdict:

27         Fuentes argues that the trial court erred when it instructed the jury that it could find him

28

guilty of count one based on a theory of first degree felony murder, with shooting from a car as the underlying felony.  Since that offense is not an enumerated felony within California's first degree felony-murder rule, we agree that it was error to give a first degree felony-murder instruction in this case.  The error was harmless, however, because the jury, applying other instructions, necessarily found all the elements of a first degree drive-by murder as defined in section 189.

In accordance with CALCRIM Nos. 548 and 540A, the court gave the jury the following instructions on felony murder:

> "The defendant has been prosecuted for murder under two theories: One, malice aforethought and, two, felony murder.

> Each theory of murder has different requirements, and I will instruct you on both.  You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories.  You do not all need to agree on the same theory.

> The defendant is charged in Count 1 with murder under a theory of felony murder.  To prove that the defendant is guilty of first-degree murder under this theory, the People must prove that, one, the defendant committed the crime of intentionally discharging a firearm from a motor vehicle; two, the defendant intended to commit the crime of intentionally discharging a firearm from a motor vehicle; and three, while committing the crime of intentionally discharging a firearm from a motor vehicle the defendant did an act that caused the death of another person.

> A person may be guilty of felony murder even if the killing was unintentional, accidental or negligent.  To decide whether the defendant committed the crime of intentionally discharging a firearm from a motor vehicle, please refer to the separate instructions that I will give you on that crime.  You must apply those instructions when you decide whether the People have proved first-degree murder under a theory of felony murder.

> The defendant must have intended to commit the felony of intentionally discharging a firearm from a motor vehicle before or at the time of the act causing the death.  It is not required that the person die immediately as long as the act causing the death and the felony or felonies are part of one continuous transaction.

> It is not required that the person killed be the victim or intended victim of the felony."

There is no doubt that these instructions were erroneous.  As this court held in <u>People v. Chavez</u> (2004) 118 Cal.App.4th 379, 385-387 (<u>Chavez</u>), discharging a firearm from a motor vehicle is not among the felonies upon which a conviction for first degree felony murder can be based.  This rule is stated, with a citation of <u>Chavez</u>, in the bench notes to CALCRIM No. 540A.  The reason for the rule is that section 189, in which first degree felony murder and drive-by murder requires an intent to kill.  An intent to kill is not an element of felony murder.  (<u>Chavez, supra</u>, 118 Cal.App.4th at pp. 385-386.)  The felony-murder instructions here told the jury it could find Fuentes guilty of first degree drive-by murder even if the killing was "unintentional."  This was incorrect.

It is true that the court also gave a correct instruction, in accordance with CALCRIM No. 521, on the elements of first degree drive-by murder, including the intent-to-kill element.  This only means, however, that the jury was given two instructions that flatly contradicted

each other and no guidance regarding which of the two it should follow.

In spite of this, we can say with certainty that the jury did find the necessary intent to kill and the other elements of first degree drive-by murder. This is because the jury made an affirmative finding under CALCRIM No. 735, the instruction for the drive-by murder special circumstance set forth in section 190.2, subdivision (a)(21). That instruction stated:

> "The defendant is charged with a special circumstance of committing murder by shooting a firearm from a motor vehicle. To prove that this special circumstance is true, the People must prove that, one, the defendant shot a firearm from a motor vehicle, killing Jesus Arredondo; two, the defendant intentionally shot at a person who was outside the vehicle; and, three, at the time of the shooting the defendant intended to kill."

The elements of this special circumstance are the same as the elements of first degree drive-by murder: "[A]ny murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." (§ 189.) The jury expressly found this special circumstance true on a separate page of the verdict form. The finding included the elements that "the murder was intentional" and that Fuentes fired the gun "with the intent to inflict death."

Under an additional instruction, the jury found for a second time that Fuentes intended to kill Arredondo. The instruction for gang-participation special circumstance set forth in section 190.2, subdivision (a)(22), stated that, to prove this circumstance, the People must prove, among other things, that "the defendant intentionally killed Jesus Arredondo." The jury found the section 190.2, subdivision (a)(22), special circumstance true. The verdict form included the jury's finding "that the murder was intentional."

The situation was similar in <u>Chavez</u>. The court instructed the jury that it could find first degree drive-by murder on a theory of felony murder, with no requirement that it find an intent to kill. (<u>Chavez, supra</u>, 118 Cal.App.4th at pp. 384, 387.) This was erroneous, but the jury also applied a correct drive-by-murder special-circumstance instruction and found that the defendant had an intent to kill when shooting from a car at the victim. (<u>Id</u>. at pp. 382, 288.) For this reason among others, the error was harmless beyond a reasonable doubt. (<u>Id</u>. at p. 390.) The beyond-a-reasonable-doubt standard of harmless error review applied because the omission of an element of an offense was implicated by the instructional error. (<u>Id</u>. at p. 387.)

In light of the jury's findings that the drive-by and gang-participation special circumstances (with their intent-to-kill requirements) were strue, we conclude there is no chance the jury would have reached a different verdict absent the error here. The error is harmless beyond a reasonable doubt.

In attempting to show that the erroneous murder instruction was prejudicial, Fuentes argues that the court gave inadequate instructions on aiding and abetting. Although the instructions stated that an aider and abettor must share the perpetrator's intent to commit the crime, he argues, they did not specify that to be guilty of murder as an aider and abettor, Fuentes must have shared the shooter's intent to kill. Fuentes contends that this is important because the jury asked questions about the aiding-and-abetting instructions.

This argument does not help Fuentes. As we have said, the jury's finding on the drive-by special circumstance leaves no doubt that the jury found Fuentes had the intent to kill. Further, the jury found true the enhancement allegations that Fuentes personally and

intentionally fired a gun, causing great bodily injury or death, so there is no doubt that it found him guilty as the shooter, not as an aider or abettor.

Doc. 1, App. A, pp. 216-219.

###    C.    The State Court Adjudication Was Neither Contrary To Nor An Unreasonable Application Of Clearly Established Federal Law

Normally, the state court adjudication involves the application of a "clearly established" federal standard of review to a petitioner's allegation of a constitutional violation, and this Court would then review that adjudication to determine whether the state court's application of the federal standard was unreasonable.  Here, however, the state court concluded that error had occurred, but determined that the error was harmless beyond a reasonable doubt.  Although the 5th DCA did not expressly cite Chapman v. California, which sets forth the "beyond a reasonable doubt" standard for harmless constitutional error, it is quite clear that this was the standard the state court was applying, especially in light of its reference to the decision in Chavez, which expressly refers to Chapman.

Where, as here, the prejudicial impact of a constitutional error in state court criminal proceedings is assessed by the state court under the Chapman standard, the federal court will review the state court adjudication pursuant to the "substantial and injurious effect" standard of Brecht, 507 U.S. at 637.  Fry, ___ U.S. ___, 127 S.Ct. 2321, 2328 (2007).  In other words, when the state court applies the Chapman standard, the state court's Chapman determination is subject to the deferential review afforded by § 2254(d)(1) because the Brecht test subsumes the § 2254(d)(1)/Chapman test. Id. at 2327 (it makes no sense to require formal application of both tests when the Brecht test subsumes the Chapman test).  Thus, this Court need only apply the Brecht test to the state court's adjudication that the error was harmless beyond a reasonable doubt.  Id.

In light of that legal reality, the analysis here is elementary.  Assuming, arguendo, that the state court correctly concluded the trial court erred by instructing the jury with conflicting instructions as to the requisite mental state for drive-by murder, the trial court's error was harmless. Under normal circumstances, such an egregious defect would be reversible.  However, as the state court correctly concluded, it is abundantly clear that the jury found beyond a reasonable doubt that

Petitioner was the shooter and that he intended to murder Arredondo by virtue of the two special allegations that the jury found true. The effect of those findings was to remedy the instructional defect regarding the requisite mental state. This is why the state court concluded that the error was harmless beyond a reasonable doubt under <u>Chapman</u>.

This Court's duty is now to assess whether the error had a "substantial and injurious" effect on the outcome under <u>Brecht</u>. For the reasons set forth above, i.e., that the defect was "cured" by the jury's findings as to the special allegations, because those allegations required an intent to kill in order to support a "true" finding, the Court can only conclude that the error, if any, did not have a substantial and injurious effect on the outcome. Hence, any error was harmless under <u>Chapman</u>. Accordingly, the claim should be rejected.

**Ground Two**     **The trial court violated Petitioner's Fourteenth Amendment rights as to attempted murder in counts two, three, and four, by misinstructing the jury on the specific intent required to find a defendant guilty of attempted murder based on a "kill zone" theory**

Petitioner next argues that the trial court violated his Fourteenth Amendment rights by misinstructing the jury regarding the "kill zone" theory and the requisite specific intent needed to prove the attempted murders of Jose Guzman, Margarito Perez, and Jaime Calderon. (Doc. 1, pp. 26-39). This contention also lacks merit.

**A.     Legal Standard**

The legal standard applicable to collateral challenges to state convictions arising from alleged instructional error was set forth in the previous section and will not be repeated.

**B.     The 5th DCA's Decision**

The 5th DCA rejected Petitioner's contention as follows:

For the three counts of attempted murder, the court gave jury instructions on the "kill zone" theory. This is the theory that a defendant who was trying to murder a particular individual meant to do it by killing everyone in a targeted area containing that individual among others, and therefore can be guilty of attempted murder of the others. The theory is based on the idea that a defendant had a specific intent to kill–the intent necessary for a conviction of attempted murder–all the people in the area. (<u>People v. Bland</u> (2002) 28 Cal.4th 313, 329-331 (<u>Bland</u>).)

"[A]lthough the intent to kill a primary target does not transfer to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person

also, concurrently, intended to kill others within...the 'kill zone.' 'The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.  For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed.  Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group.  The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.  When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death.'" (<u>Bland, supra,</u> 28 Cal.4th at pp. 329-330, quoting <u>Ford v. State</u> (Md. 1993) 625 A.2d 984, 1000-1001.)

The court instructed the jury on attempted murder in accordance with former CALCRIM No. 600.  The instruction included these statements:

"A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of [harm] or kill zone.

"In order to convict the defendant of the attempted murder of Jose Guzman, Margarito Perez, or Jaime Calderon, the People must prove that the defendant not only intended to kill Margarito Perez but also intended to kill Jose Guzman, Margarito Perez or Jaime Calderon or intended to kill anyone within the kill zone.

"If you have a resaonble doubt whether the defendant intended to kill Jose Guzman, Martarito Perez, Jaime Calderon or intended to kill Margarito Perez by harming anyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Jose Guzman, Martarito Perez and Jaime Calderon."

Fuentes contends that the reference to an intent to kill by "harming anyone in the kill zone," rather than by killing everyone in the kill zone, was erroneous.  We agree.  While the <u>Bland</u> court's quotation of the Maryland Court of Appeals' opinion in <u>Ford</u> included a similar equivocation between an intent to kill people in the zone and an intent to harm them, the real meaning of the kill-zone doctrine must be that the defendant has a specific intent to kill everyone in the zone.  Our Supreme Court made it clear in <u>Bland</u> that a conviction of attempted murder requires a finding that the defendant had a specific intent to kill the victim of the attempt; no transferred intent is legally possible and no state of mind short of an intent to kill-such as implied malice-is sufficient.  (<u>Bland, supra,</u> 28 Cal.4th at pp. 326-329.)  The point of the kill-zone theory is that deadly force directed at a group of people with the primary goal of killing one of them can still be a basis of convictions of attempting to murder the others if the defendant intended to kill each of them as well.  There is no likelihood that the Supreme Court meant an intent merely to harm the others would suffice to support convictions of attempting to murder them.

The error is harmless beyond a reasonable doubt, however.  Despite the flaw Fuentes points to, the instruction repeatedly stated that the jury must find an intent to kill Guzman, Perez, and Calderon or an intent to kill anyone in the kill zone.  Further, the instructions included a generic attempted-murder instruction in addition to the kill-zone instruction, which also set

out the requirement that an attempted murderer must intend to kill the victim:

> "To prove the defendant is guilty of attempted murder the People must prove that, one, the defendant took at least one direct but ineffective step towards killing another person; two, the defendant intended to kill that person."

In light of this, there is no likelihood the defective language caused the jurors to think only an intent to harm the victims was necessary. It is also significant that the evidence that Fuentes fired many times into a zone occupied by a rival gang member and his companions, hitting two of them and killing one, makes this a typical kill-zone case; the inference that Fuentes intended to kill all four victims was compelling. We are confident beyond a reasonable doubt that the jury would not have reached a different verdict absent the mistake in the instruction.

In People v. Bragg (2008) 161 Cal.App.4th 1385, as in this case, the Court of Appeal considered the argument that the reference to an intent to harm in former CALCRIM No. 600 was erroneous. (People v. Bragg, supra, at p. 1395.) It concluded there was no error because "[n]o reasonable juror could have failed to understand from the instructions as a whole that...the harm to which the court referred was the ultimate harm of death...." (Id. at p. 1396.) We similarly conclude that the jury could not reasonably have failed to understand the intent-to-kill requirement. Unlike the Bragg court, however, we describe this as harmless error, rather than no error. The challenged portion of the instruction refers to the required intent as an intent to harm, and this is an incorrect statement of the law.

(Doc. 1, App. A, pp. 219-224.)

## C.    Analysis

Under California law, attempted murder requires a specific intent to kill; implied malice will not suffice. People v. Lee, 31 Cal.4th 613, 623 (2003). First degree murder may be found when the prosecution proves beyond a reasonable doubt that the actor killed with malice aforethought, intent to kill, premeditation, and deliberation. People v. Memro, 11 Cal.4th 786, 862 (1995); see also Cal. Pen. Code §§ 187, 189. Intent to kill is rarely proved by direct evidence; usually it must be inferred from circumstantial evidence. People v. Ramos, 121 Cal.App.4th 1194, 1207-1208 (2004).

In People v. Bland, 28 Cal.4th 313 (2002), the California Supreme Court held that attempted murder requires the specific "intent to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." Bland, 28 Cal.4th at 328. Bland also held, however, that there could be a concurrent intent such that "a person who shoots at a group of people [may still] be punished for the actions towards everyone in the group even if that person primarily targeted only

one of them." Id. at 329.  Concurrent intent can be inferred "'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity,'" an area referred to as a "kill zone." Id.  Bland noted that "[t]his concurrent intent theory is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent.  Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." Id. at 331.

Here, Petitioner focuses on the fact that, despite the language in the instruction itself referring to "killing" individuals in the "zone of harm" or "kill zone," the trial judge said, in instructing the jury, "harming anyone in the kill zone."  The clerk's transcript shows that the printed instruction read "harming everyone in the kill zone."  The pattern instruction read "harming everyone in the kill zone."  (Doc. 1, App. A, p. 222 n. 3.)  The question, then, is what effect, if any, did those misstatements of the instruction have on the outcome of the trial.

First, to the extent that Petitioner is contending simply that the trial court instructed the jury on former  CALCRIM No. 600 contrary to California law, such a contention is beyond the purview of this Court in a federal habeas proceeding.  The issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief.  Estelle v. McGuire, 502 U.S. 62, 68 (1991). ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").  Indeed, federal courts are bound by state court rulings on questions of state law.  Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).  Moreover, a petitioner may not transform a state-law issue into a federal one by simply asserting a due process violation.  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).

Second, to the extent that Petitioner is charging a federal constitutional violation, he must show the purported instructional error "so infected the trial with unfairness as to make the resulting

1  conviction a denial of due process." Lewis v. Jeffers, 497 U.S. 769, 780, 110 S.Ct. 3092 (1990).

2  Petitioner has failed to meet that burden.

3       Initially, Respondent challenges the 5th DCA's conclusion that the instruction, as given, was

4  erroneous.  Respondent points to the California Supreme Court subsequent decision in People v.

5  Stone, 46 Cal.4th 131 (2009), in which the state high court rejected the arguments that the use of the

6  term "anyone" in the former CALCRIM No. 600 was fatally ambiguous or that the last sentence of

7  the instruction, i.e., "harming anyone in the kill zone," could be construed as a mere intent to

8  "harm" rather than an intent to "kill." Stone, 46 Cal.4th at 138 n. 3.[2]

9       However, the Court need not delve into the nuances of this state law issue, as explicated in

10 the above-referenced state cases, because the Court agrees with the 5th DCA that, assuming arguendo

11 that the instruction, as given, was error, the error was harmless.  As the 5th DCA noted, the kill-zone

12 instruction refers to some variant of the phrase "intent to kill" no less than eight separate times; it

13 never refers to a mere "intent to harm." (CT 773).  Moreover, in addition to the specific kill-zone

14 instructional language, the instruction also included generic attempted-murder language that set out

15 the requirement that an attempted murderer must intend to kill the victim.  (Id.).  Finally, the

16 evidence of Petitioner's intent to kill individuals within the kill-zone, as demonstrated by firing

17 multiple times into a large group of individuals confined in a relatively small space is, as the 5th DCA

18 modestly characterized it, "compelling, " if not overwhelming.  (Doc. 1, App. A, p. 224).  Thus, the

19 state court's conclusion that the error was harmless beyond a reasonable doubt was not contrary to

20 clearly established federal law.  Accordingly, this claim should be rejected.

21 ///

22 ///

23 ///

24 ///

25

26

27   [2] To further complicate this point, People v. Campos, 156 Cal.App.4th 1228 (2007), held the instruction's language
was not erroneous because, among other reasons, "[a] defendant who shoots into a crowd of people with the desire to kill
anyone he happens to hit, but not everyone, surely has the specific intent to kill whomever he hits...." Id. at p. 1243.

28

1   **Ground Three**          **The trial court violated Petitioner's Fourteenth Amendment rights by**
2                                      **failing to instruct the jury that CALCRIM No. 370 did not apply to the**
                                        **substantive gang offense charged in count 9, the special circumstance**
                                        **alleged in count one, or to the gang enhancements alleged in counts one,**
3                                      **two, thre, four, five, six, seven, and eight.**

4          Petitioner next argues that the trial court erred in failing to instruct the jury that CALCRIM

5   No. 370, which provides that the prosecution is not required to prove motive, was not applicable to

6   the crime of participating in a criminal street gang (count 9), the special circumstance of count one,

7   or the enhancements of counts one through eight.  (Doc. 1, pp. 41-47).  Again, this contention lacks

8   merit.

9          **A.      The Legal Standard**

10         The legal standard applicable to collateral challenges to state convictions arising from alleged

11  instructional error was set forth previously and will not be repeated.

12         **B.      The 5th DCA's decision**

13         The state court rejected Petitioner's claim as follows:

14  In accordance with CALCRIM No. 370, the court instructed the jury as follows regarding
    motive:

15
16         "The People are not required to prove that the defendant had a motive to commit any
           of the crimes charged.  In reaching your verdict you may however consider whether
           the defendant had a motive.  Having a motive may be a factor tending to show that the
17         defendant is guilty.  Not having a motive may be a factor tending to show the
           defendant is not guilty."
18
19  Fuentes argues that this instruction conflicted with the instructions for the substantive offense
    of criminal street gang participation and the sentence-enhancement and special-circumstance
    provisions related to criminal street gangs and lessened the prosecution's burden of proof on
20  those issues.  The instruction for the substantive offense (§ 186.22, subd. (a)) stated:

21         "To prove that the defendant is guilty of this crime, the People must prove that, one,
           the [d]efendant actively participated in a criminal street gang; two, when the
22         defendant participated in the gang he knew that members of the gang engaged in or
           have engaged in a pattern of criminal gang activity; and, third, the defendant willfully
23         assisted[,] further[ed or] promoted felonious criminal conduct by members of the
           gang."
24
25  The instruction for the section 190.2, subdivision (a)(22), special circumstance required a
    finding that "the murder was carried out to further the activity of the criminal street gang."
    The instruction for the section 186.22, subdivision (b), enhancement required a finding that
26  "the defendant intended to assist, further or promote...criminal conduct by gang members."
    Fuentes argues that, although each of these instructions required a finding that he had an
27  intent to further gang activity, the motive instruction contradicted this, telling the jury it did

28

not have to make that finding.  We disagree.

An intent to further criminal gang activity is no more a "motive" in legal terms than is any other specific intent.  We do not call a premeditated murderer's intent to kill a "motive," though his action is motivated by a desire to cause the victim's death.  Combined, the instructions here told the jury the prosecution must prove that Fuentes intended to further gang activity but need not show what motivated his wish to do so.  This was not ambiguous and there is no reason to think the jury could not understand it.  Fuentes claims the intent to further criminal gang activity should be deemed a motive, but he cites no authority for this position.  There was no error.

If Fuentes's argument has a superficial attractiveness, it is because of the common-sense concept of a motive.  Any reason for doing something can rightly be called a motive in common language, including–but not limited to–reasons that stand behind other reasons.  For example, we could say that when A shot B, A was motivated by a wish to kill B, which is turn was motivated by a desire to receive an inheritance, which in turn was motivated by a plan to pay off a debt, which in turn was motivated by a plan to avoid the wrath of a creditor. That is why there is some plausibility in saying the intent to further gang activity is a motive for committing a murder: A wish to kill the victim was a reason for the shooting, and a wish to further gang activity stood behind that reason.  The jury instructions given here, however, were well adapted to cope with the situation.  By listing the various "intents" the prosecution was required to prove (the intent to kill, the intent to further gang activity), while also saying the prosecution did not have to prove a motive, the instructions told the jury where to cut off the chain of reasons.  This was done without saying anything that would confuse a reasonable juror.

People v. Maurer (1995) 32 Cal.App.4th 1121, 1126-1127, 38 Cal. Rptr. 2d 335, on which Fuentes relies, does not conflict with what we have said.  Maurer held that the standard motive instruction was erroneous when given in conjunction with an instruction on section 647.6, which prescribes punishment for "[e]very person who, motivated by an unnatural or abnormal sexual interest in children, engages in conduct with an adult whom he or she believes to be a child" where the conduct would be an offense if the other person really were a child.  Since this offense includes a "motivation" as one of its elements, a jury naturally would be confused by an instruction saying the prosecution need not prove the defendant's motive.  Due to this peculiarity in the definition of the offense (the Maurer court called the section "a strange beast" (People v. Maurer, supra, 32 Cal.App.4th at p. 1126, 38 Cal. Rtpr. 2d 335)), the combination of instructions could not successfully tell the jury where to cut off the chain of reasons for the defendant's action which the prosecution had to prove.  If section 647.6 referred to, say, persons acting "with an intent to gratify an unnatural or abnormal sexual interest in children" instead of a motivation, the standard motive instruction would have been no more problematic than it is here.

(Doc. 1, App. A, pp. 224-226.)

## C.    Analysis

In this case, the state court determination that the jury did not confuse the instructions or

misapply them was not unreasonable.  By the express terms within the instructions, CALCRIM No.

370 applied only to the various substantive charges, not to any of the special allegations; hence, it

would have applied to the substantive criminal street gang-participation charge, but not to any street

gang special circumstances.  (CT 741; 784).  By contrast, CALCRIM No. 736 applied only to the

special-circumstance gang allegation. (CT 771).  The instructions were not ambiguous and a jury

could not reasonably have been confused about how to apply them.  Certainly, Petitioner has failed

to show how these instructions could have led the jurors to interpret the instructions to mean that the

prosecution was relieved of its burden of proving the intent element of the charged crime beyond a

reasonable doubt.  Indeed, to draw such a conclusion, jurors would have had to irrationally and

unreasonably disregard the clear directions provided by the instructions discussed above at length by

the 5th DCA, including the distinctions drawn by those instructions between the prosecution's burden

of proof with respect to the charged crimes and with respect to the gang enhancement.  No basis

exists in this record to assume that the jurors acted in this unreasonable and irrational fashion.

Moreover, and significantly, the state court correctly refused to conflate the concepts of

motive and intent, as Petitioner's claim has done.  As the 5th DCA noted, "An intent to further

criminal gang activity is no more a 'motive' in legal terms than is any other specific intent . . .

Combined, the instructions here told the jury the prosecution must prove that [Petitioner] intended to

further gang activity but need not show what motivated his wish to do so.  This was not ambiguous

and there is no reason to think the jury could not understand it."  Considering all of the instructions

and the trial record as a whole, see Boyde v. California, 494 U.S. at 378, no reasonable likelihood

existed that the jury applied the instruction in a manner inconsistent with the U.S. Constitution.  See

Middleton v. McNeil, 541 U.S. 433, 437, 124 S.Ct. 1830 (2004).  This conclusion is consistent with

prior decisions by federal courts in California addressing this precise issue.  E.g., Orona v.

Hedgepeth, 2012 WL 3704815, *21 (E.D. Cal. Aug. 24, 2012); Miller v. Harrington, 2011 WL

6134237 *11 (C.D. Cal. Oct. 19, 2011).

Thus, the state court adjudication of this claim did not result in a decision that was contrary

to, or involved an unreasonable application of, clearly established federal law, nor did it result in a

decision that was based on an unreasonable determination of the facts in light of the evidence.  28

U.S.C. § 2254(d).  Accordingly, the claim should be denied.

| | |
|---|---|
| **Ground Four** | **The special circumstance statute is unconstitutional as applied and violates Petitioner's Eighth Amendment right by failing to narrow the class of persons eligible for life in prison without parole because it permits the jury to use the same facts to establish both first-degree murder and the special circumstance of discharging a firearm from a motor vehicle with the intent to inflict death.** |

Petitioner next argues the special circumstance statute was unconstitutional as applied in this case, because it failed to narrow the class of persons eligible for life in prison without parole, as it permitted the jury to use the same facts to establish both first degree murder and the "enhancing" special circumstance of discharging a firearm from a motor vehicle with the intent to inflict death." (Doc. 1, pp. 49-58).   This contention must also be rejected.

### A.    Legal Standard

The Eighth Amendment forbids the infliction of cruel and unusual punishment.  Although the Eighth Amendment does not prohibit the death penalty, it does require that a capital sentence "not be imposed under sentencing procedures that create[ ] a substantial risk that it would be inflicted in an arbitrary and capricious manner."  Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909 (1976); Godfrey v. Georgia, 446 U.S. 420, 427, 100 S.Ct. 1759 (1980).  Thus, to satisfy the strictures of the Eighth Amendment, a state's "capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'"  Lowenfield v. Phelps, 484 U.S. 231, 244, 108 S.Ct. 546, 554 (1988); Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742 (1983).

Under California law, a defendant convicted of first degree murder with the special circumstance of intentional murder by discharging a firearm from a vehicle at another person with intent to kill, as provided in Cal. Pen. Code § 190.2(a)(21), is subject to a sentence of life with the possibility of parole.  The subsection provides for an LWOP sentence when the factfinder finds that "the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person or persons outside the vehicle with the intent to inflict death."  This special circumstance is defined in the same terms as the third category of first degree murder defined in Cal. Pen. Code § 189.  People v. Rodriguez, 66 Cal.App.4th 157, 164 (1998).  "Read together,

sections 189 and 190.2(a)(21) provide that any intentional murder committed by shooting out of a vehicle is punishable either by death or life without parole, but not by 25 years to life." Id.

## B.   The 5th DCA's Decision

The 5th DCA rejected Petitioner's argument as follows:

Fuentes argues that the drive-by special circumstance set out in section 190.2, subdivision (a)(21), violates the Eighth Amendment as applied in this case because it resulted in a sentence of life without parole based on the same facts that made the murder a first degree murder.  This argument is based on case law holding that death penalty laws must provide objective standards to narrow the class of murders to which the death penalty is applicable.  (Zant v. Stephens (1983) 462 U.S. 862, 876; People v. Bacigalupo (1993) 6 Cal.4th 457, 465.)  Fuentes interprets this case law as implying that, where one statute defines a type of offense as first degree murder, which in California can lead to a sentence of death, life without parole, or 25 years to life (§ 190, subd. (a)), another statute mandating life without parole as a minimum sentence must define a narrower class of offenses than the first statute.  In other words, he says it is unconstitutional if an entire defined subclass of first degree murders, such as drive-by murders, has a minimum sentence of life without parole.

This argument is weak, as the class of drive-by murders defined as first degree murders by section 189 is already a narrow class defined by objective standards.  Nothing in the case law suggests that it is unconstitutional for a narrowly defined subclass of murders subject to life without parole to coincide with a narrowly defined subclass of first degree murders.

Fuentes acknowledges that we are precluded from embracing his view by California Supreme Court cases upholding various statutory special circumstances over Eighth Amendment challenges relating to assertedly insufficient narrowness.  (See, e.g., People v. Pollock (2004) 32 Cal. 4th 1153, 1196 ["This court has consistently rejected the claim that the statutory special circumstances...do not adequately narrow the class of persons subject to the death penalty"]; People v. Catlin (2001) 26 Cal.4th 81, 158 ["First degree murder liability and special circumstance findings may be based upon common elements without offending the Eighth Amendment"].)  He also observed that the Second District Court of Appeal has rejected an Eighth Amendment challenge to the section 190.2, subdivision (a)(21), special circumstance in particular.  (People v. Rodriguez (1998) 66 Cal.App.4th 157, 164, 173-174.)  He makes the argument only to preserve it for later review.  We conclude there is no error.

(Doc. 1, App. A, pp. 226-227.)

## C.   Analysis

Petitioner's argument relies exclusively upon jurisprudence that relates to death penalty cases.  Petitioner, however, was not sentenced to death.  Although the Eighth Amendment requires state sentencing schemes to provide a meaningful basis for distinguishing between defendants who are sentenced to death and defendants who are not, see Godfrey, 446 U.S. at 427, the Supreme Court has refused to extend this rule to require states to distinguish between defendants sentenced to life with the possibility of parole and defendants sentenced to life without the possibility of parole.  See

1   Harmelin v. Michigan, 501 U.S. 957, 994-996, 111 S.Ct. 2680 (1991)(because of the "qualitative

2   difference between death and all other penalties," "[w]e have drawn the line of required

3   individualized sentencing at capital cases, and see no basis for extending it further [to LWOP]."); see

4   also Houston v. Roe, 177 F.3d 901, 906 (9th Cir. 1999)("the California Penal Code does not violate

5   the eighth Amendment by failing to extend the Godfrey doctrine to LWOP [life without the

6   possibility of parole] crimes"); Gonzalez v. Prunty, 959 F. Supp. 1264, 1272-1273 (C.D.Cal.

7   1997)(declining to apply "current death penalty jurisprudence" to petitioner's claim that California

8   courts have so broadly defined the special circumstance of lying in wait that it does not differ from

9   ordinary premeditated murder and thus does not justify a sentence of life without the possibility of

10   parole).

11          Moreover, even in the capital context, it is not unconstitutional for a special circumstance to

12   duplicate elements of the conviction offense.  See Lowenfield, 484 U.S. at 243-244 (the fact that

13   aggravating circumstance duplicates an element of the crime does not make a sentence

14   constitutionally infirm).  Based on Lowefield, California courts have repeatedly held that, given the

15   nature of the California sentencing scheme, dual use of the same facts to elevate a homicide to first

16   degree murder and to render the defendant eligible for the death penalty does not violate the Eighth

17   Amendment.  See, e.g., People v. Abilez, 41 Cal. 4th 472, 528 (2007)("[W]e have determined that

18   first degree murder liability and special circumstances may be based upon common elements without

19   offending the Eighth Amendment."); People v. Rodriguez, 66 Cal.App.4th at 164 (under Lowenfield,

20   argument that drive-by shooting special circumstance in unconstitutional because it duplicates the

21   elements that elevated murder to first degree has no merit).  This is a reasonable application of

22   Lowenfield.  In turn, federal courts within California have regularly upheld such state court

23   determinations and rejected arguments such as the one proffered here by Petitioner.  E.g., Nichols v.

24   Clark, 2012 WL 1019976 (C.D. Cal. Feb. 29, 2012); Villalobos v. Kernan, 2009 WL 1605652 (C.D.

25   Cal. June 5, 2009); Gonzalez v. Prunty, 959 F. Supp. at 1272-1273.

26          Accordingly, the state court's rejection of this claim was not contrary to, nor an unreasonable

27   application of clearly established federal law.  28 U.S.C. § 2254(d)(1).  Hence, this contention should

28

1   be rejected.

2   **Ground Five**         **The trial court erred in imposing the upper term of imprisonment and
                            consecutive terms in violation of the Sixth and Fourteenth Amendments**

3

4       Petitioner next contends that the trial court violated his right to a jury trial by imposing the

5   upper term for count two and consecutive sentences on the other convictions.   As with the other four

6   grounds, this contention is without merit.

7       **A.       Legal Standard**

8       In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the United States Supreme

9   Court held as a matter of constitutional law that, other than the fact of a prior conviction, "any fact

10  that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to

11  a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  In Blakely v. Washington, 542

12  U.S. 296, 124 S.Ct. 2531 (2004), the Supreme Court held that the "statutory maximum for Apprendi

13  purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in

14  the jury verdict or admitted by the defendant."  Blakely, 542 U.S. at 303.  There is a narrow

15  exception to this rule, however, for enhancements that are based on prior convictions; these need not

16  be submitted to the jury.  See Almendarez-Torres v. United States, 523 U.S. 224, 244, 118 S.Ct.

17  1219 (1998)("[T]o hold that the Constitution requires that recidivism be deemed an 'element' of

18  petitioner's offense would mark an abrupt departure from a longstanding tradition of treating

19  recidivism as "go[ing] to punishment only.'"); Butler v. Curry, 528 F.3d 624, 641 (9th Cir. 2008).

20      In People v. Black, 35 Cal.4th 1238 (2005)("Black I"), the California Supreme Court held

21  that California's statutory scheme providing for the imposition of an upper term sentence did not

22  violate the constitutional principles set forth in Apprendi and Blakely.  The Court in Black I reasoned

23  that the discretion afforded to a sentencing judge in choosing a lower, middle or upper term rendered

24  the upper term under California law the "statutory maximum."  Black I, 35 Cal. 4th at 1257-1261.

25      In Cunningham v. California, 549 U.S. 270, 127 S.Ct. 856 (2007), the United States Supreme

26  Court held that a California judge's imposition of an upper term sentence based on facts found by the

27  judge (other than the fact of a prior conviction) violated the constitutional principles set forth in

28

Apprendi and Blakely.  Cunningham expressly disapproved the holding and the reasoning of Black I, finding that the middle term in California's determinate sentence law was the relevant statutory maximum for purposes of applying Blakely and Apprendi.  Cunningham, 549 U.S. at 291-294.  However, the Cunningham court suggested that California could comply with the federal jury-trial constitutional guarantee while still retaining determinate sentencing if it allowed trial judges broad discretion in selecting a term within a statutory range, thereby eliminating the requirement of a judge-found factual finding to impose an upper term.  Cunningham, 549 U.S. at 292-294.  In light of Cunningham, the U.S. Supreme Court vacated Black I and remanded the case to the California Supreme Court for further consideration.  Black v. California, 549 U.S. 1190, 127 S.Ct. 1210 (2007).

The California Legislature took quick action in response to Cunningham and amended the pertinent determinate sentencing statute, Cal. Pen. Code § 1170 so that (1) the middle term was no longer the presumptive term absent aggravating or mitigating facts found by the trial judge; and (2) the trial judge has the discretion to impose an upper, middle or lower term based on reasons he or she stated.  People v. Wilson, 164 Cal.App.4th 988, 992 (2008).

On remand, the California Supreme Court held that "so long as a defendant is eligible for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury."  People v. Black, 41 Cal.4th 799 (2007) ("Black II").  In other words, as long as one aggravating circumstance has been established in a constitutional manner, a defendant's upper term sentence withstanding Sixth Amendment challenge.  Thereafter, relying on Black II, the Ninth Circuit affirmed that, under California law, only one aggravating factor is necessary to authorize an upper term sentence.  Butler, 528 F.3d at 641-643.

**B.     The 5th DCA's Opinion**

In a reasoned opinion, the 5th DCA rejected Petitioner's claim, holding that, because Petitioner was sentenced after the effective date of the amendment to § 1170, any claim arising under

the Apprendi/Blakely/Cunningham line of cases was inapplicable since the amended state statute

complied with constitutional norms as set forth by the U.S. Supreme Court:

> Blakely and Cunningham are inapplicable to the upper term imposed in this case because, as [the 5th DCA's opinion] acknowledges, [Petitioner] was sentenced after the effective date of the statute known as Senate Bill 40 (Stats. 2007, ch. 3), which amended California's determinate sentencing law (§ 1170) to comply with Blakely and Cunningham.  Under the new statute, there is no presumption in favor of the middle term, and sentencing judges may impose whichever term "in the court's discretion, best serves the interests of justice," without making factual findings (though they must still supply reasons.) (§ 1170, subd. (B).)  This change was designed to meet the requirement, set forth in Blakely and applied to California in Cunningham, that if, under state law, a sentence can be imposed only after a factual finding, the finding must be made by the jury or admitted by the defendant, or must be the fact of a prior conviction . . . Senate Bill No. 40 eliminated the Blakely/Cunningham problem for upper terms by eliminating the requirement of factual findings as a basis for an upper term.

> . . . [T]he purpose of Senate Bill No. 40 was to eliminate the requirement that factual findings be made in the first place, making the Blakely/Cunningham objection that necessary facts were not found by the jury or admitted by the defendant inapplicable.  Fuentes does not supply any reasons why the new law fails to achieve this objective.

> . . .

> On the issue of consecutive sentences, Fuentes's position has been rejected by the California Supreme Court in . . . [Black I].  The court reaffirmed this conclusion in [Black II], stating that it was not undermind by Cunningham.  Further, after the parties' briefs were filed in this case, the United States Supreme Court held in Oregon v. Ice, 555 U.S. __, 129 S.Ct. 711, 715-716, that the requirements of Blakely do not apply to findings used to impose consecutive sentences.  There was no error in the imposition of consecutive sentences here.

> Fuentes acknowledges that we are bound by applicable authority to reject his arguments based on Blakely and Cunningham.  He presents these arguments to preserve them for later review.  We conclude there is no error.

(Doc. 1, App. A, pp. 228-230.)

## C.      Analysis

From the foregoing, it is clear that, as the 5th DCA noted, California's amendment to the

determinate sentencing, as embodied in Senate Bill No. 40, eliminated the requirement for factual

findings to be made.  It necessarily follows, then, that any constitutional argument based on who did,

or did not, make factual findings, must fail in this context.  And, even were that not so, as

Respondent correctly points out, Black II held that "imposition of the upper term does not infringe

upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating

circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified

based upon the defendant's record of prior convictions." Black II, 41 Cal. 4th at 816.  Such a view has been endorsed by the Ninth Circuit.  Butler, 528 F.3d at 638-639.  Here, the trial court found that Petitioner had "sustained petitions in juvenile delinquency proceedings" that were "numerous," and that he "had a prior conviction for two counts as an adult . . ." (RT, v. 11, p. 2117).  Accordingly, based solely on Petitioner's prior criminal history, he was not legally entitled to a middle-term sentence.  Black II, 41 Cal. 4th at 813.

Petitioner also loses insofar as his claim of error relates to the consecutive sentences imposed.  As mentioned, the Apprendi/Blakely/Cunningham factual finding requirements do not apply to findings of fact necessary for the imposition of consecutive sentences.  See Oregon v. Ice, 555 U.S. 160, 129 S.Ct. 711, 718-719 (2011).  Accordingly, this claim must be rejected.

### RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be **DENIED** with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty (20) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **December 19, 2012**                                    **/s/ Jennifer L. Thurston**

UNITED STATES MAGISTRATE JUDGE